IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**MICHAEL RUDARMEL**,

      Plaintiff,                                 No. 3:10-cv-848-MO

          v.                                OPINION AND ORDER

**UNITED OF OMAHA LIFE INSURANCE COMPANY**,

      Defendant.

      **MOSMAN, J.**,

      Michael Rudarmel is a RE/MAX real estate agent who fell off the roof of his house and was seriously injured on November 18, 2006.   He is suing his insurer, United of Omaha Life Insurance Company ("United"), in this non-ERISA case regarding his disability coverage. Each side moves for summary judgment on issues of insurance policy interpretation. For the reasons discussed below: (1) I grant United's Motion for Summary Judgment [51]; (2) I deny plaintiff's Motion for Partial Summary Judgment [18] as moot; and (3) I deny United's motions to amend ([39] and [42]) as moot.

## BACKGROUND

Plaintiff must establish that after his injury he was unable to generate earnings ("Current Earnings") that exceeded 80% of his earnings before his injury ("Basic Monthly Earnings" or "BME"). The parties dispute the calculation of plaintiff's pre- and post-injury earnings.

Plaintiff must show that for three of six months (90 of 180 days) after his injury, he was unable to "generate Current Earnings" that were 80% of his Basic Monthly Earnings prior to injury. The method of calculating BME is disputed and the subject of plaintiff's motion for summary judgment.   However, for purposes of this opinion, I operate on the assumption that plaintiff's calculation is controlling, because I believe United prevails even using plaintiff's BME calculation.   In this case, the average of plaintiff's monthly gross earnings from the 24 months prior to injury came out to $9600 (his BME), and 80% of that is $7680 (the threshold for Current Earnings).

While the parties dispute when current earnings should be measured (see section I.A below), and what should be included in them (section I.B), plaintiff does not dispute that United has the right to calculate his periodic "Current Earnings" using a three-month averaging formula, whereby "Current Earnings" for each period are measured as an average of the 30-day period in question and the two previous periods.   Plaintiff was injured on November 18, so the 180-day period began that day, and each 30-day period ran from the 18th of one month to the 17th of the next. For example, to measure the Current Earnings for the period of 3/18/07–4/17/07, we take the commissions earned between 1/18/07 and 4/17/07 and divide them by three.

## DISCUSSION

By United's calculations, plaintiff earned over 80% of his BME (even by plaintiff's own BME calculation) in four of the six month-long periods following his injury; therefore, plaintiff

failed to meet the policy's requirement that he fall below the 80% threshold for 90 days within the 180 days following injury.   I agree.

**I.**     **United's Motion for Summary Judgment**

Plaintiff takes issue with three pieces of United's math.   First, United counted any money plaintiff received after the injury date as Current Earnings, while plaintiff argues only monies that he "generated" (the policy's language) should be included; and he defines "generated" to include all of the work engaged in by a real estate broker that leads up to a closing.   Second, United counted plaintiff's gross commissions; plaintiff argues that only his net commissions should be counted.   And third, plaintiff points out that United mistreats the commission on the Sheridan Street transaction.

**A.**     ***"Generated" means "earned"***

I reject both parties' positions and hold that the closing date of any particular transaction dictates when "Current Earnings" were "generated."

United argues that "[o]ne does not generate earnings until he or she actually has payment in hand."   United provides no support for such a facile definition, which has potentially ridiculous outcomes: e.g., if an employer delays *payment* to an employee after he's earned it, the employee would only "generate" earnings when he finally obtained payment.   The policy defines "Current Earnings," in relevant part, as "any actual pre-tax monthly income You receive while You are working and eligible to receive a Monthly Benefit . . . ."   While that definition includes the term "receive," it certainly does not follow that to "generate" Current Earnings also means to receive them.   It seems far more likely that because United plainly knew how to use the word "receive" when it intended that meaning, United must have meant something other than "receive" when it chose to use the word "generate."

3 – OPINION AND ORDER

Although United's definition is unconvincing, plaintiff's position is also untenable. He suggests that "generated" should only include earnings for which he did all of the preparatory "legwork" within the relevant period. That also can't be the correct analysis for at least two reasons: (1) as any real estate agent knows all too well, an agent does not earn anything until closing because the parties walk away before closing for many different reasons; and (2) plaintiff's definition offers no way to determine the parameters of "generate" and no mechanism by which I might determine to which periods his Current Earnings should be allocated; i.e., did plaintiff "generate" a certain percentage of the eventual commission in each of several months in which he gave his business card to someone, followed up with that person, agreed to market that person's home, held open houses, etc.?[1]  Thus, I find plaintiff's vague definition of "generate" unworkable.

Instead, I hold that plaintiff generated income at the time he closed a transaction. "Earned" is the plain meaning (and only workable meaning) of "generated" here and plaintiff did not "earn" money until he closed a transaction.   When the closing date is used to measure plaintiff's Current Earnings, United's calculations are substantially correct[2] (with the exception of the Sheridan Street transaction, discussed below). *See* United's Reply (#62) 7.

––––––––––––––––––––

[1]  I also do not see plaintiff including in his "current earnings" fees that he received after the relevant period, but for which he must have done some work during the relevant period.   Thus, it seems that plaintiff may really be defining "generate" as "money actually received in the same period in which all income-generating work was performed." Plaintiff offers no support for such a limited definition.

[2]  It appears the closing date was generally only a couple days before plaintiff received payment; and because United used the receipt date, United's calculations are almost entirely accurate. I do note one transaction where the closing was on 3/16/07 and the money received on 3/19/07; because the relevant 30-day periods after plaintiff's disability ran from the 18th-17th of the months, my holding (that closing is the date of income generation) would actually move that payment into the 2/18–3/17 period instead of the 3/18–4/17 period.   Despite that change, the three-month averaging formula prevents any change regarding which months were over the 80% threshold.

**B.**    ***Plaintiff's "Current Earnings" should include his gross commissions***

For three reasons, I hold that plaintiff's Current Earnings include his gross commissions:

First, although RE/MAX actually receives commissions and then remits plaintiff's portion to him, plaintiff's agreement with RE/MAX clearly provides that plaintiff pays RE/MAX fees on each transaction.   *See* Declaration of Rosemary Meeuwsen (#58) 3.   This arrangement strongly suggests that the entire gross commissions are plaintiff's earnings, and the fees he pays RE/MAX over the year are simply business expenses; in order for plaintiff to *pay* those fees to RE/MAX, he must have received the money from which he could make the payment.

Second, and perhaps more telling, plaintiff himself included his gross commissions when calculating his BME.   That is, he took his gross commissions for the 24 months prior to his injury and averaged them.[3]   Plaintiff provides no explanation for why the gross commissions should be used to calculate BME, but the net should be used for Current Earnings—other than the obvious reason that he wanted his BME to be higher and his Current Earnings to be lower.

Third, even if plaintiff had argued for using net commissions in calculating both BME and Current Earnings, there is another compelling reason to use gross commissions for both calculations that neither side addressed.   The largest fee plaintiff paid to RE/MAX was known as the Annual Fee West ("AFW").   The AFW was a flat fee charged each year as a percentage of commissions only until paid in full.   During the relevant 180-day post-injury period for measuring "Current Earnings," which was almost entirely in early 2007, plaintiff was still paying the full AFW—which made his net commission per sale look significantly lower than the gross. However, as I looked over plaintiff's chart of the 24 months prior to the injury, I noticed that he

---

[3] *See* Patton Decl. (#63) Ex. 2 at 2.

paid off the AFW each year by mid-year, and then got to keep a much higher percentage of gross commissions after that.    So, his average net commission over 24 months includes months paying the AFW, but also months *not* paying that fee; thus, the average net fees over those 24 months would be substantially higher than the average net fees plaintiff made during the early part of 2007, when he was still required to pay the AFW on most, if not every, transaction.    For that reason, it would make little sense to compare the full net BME average to the skewed net Current Earnings, and I use gross commissions in both calculations.

C.    *Plaintiff fails even if the Sheridan Street transaction is treated properly*

Plaintiff is correct that the Sheridan Street transaction should not be included at $3000, because it was reversed a week later and re-credited at only $2250 after a portion was paid to another agent.    (United's Memo. in Supp. (#52) 6.)    Because I hold that the closing date of a transaction dictates that payment's Current Earnings period, the $2250 commission (instead of $3000) would still be in the 3/18/07–4/17/07 period because that transaction must have closed before 4/13/07, when RE/MAX received payment. When the $2250 commission is included in that period, the three-month average for that period becomes $7774 and change—just over even plaintiff's calculation of 80% of BME.[4]

D.    *Conclusion*

Plaintiff failed to show that his Current Earnings were below 80% of his BME for at least three of six months after his injury—even using his higher calculation of BME.    His Current

---

[4] The gross commissions earned between 1/18/07 and 4/17/07, including the $2250 Sheridan Street transaction instead of the $3000 figure, total $23,324. Thus, the three-month average is $7,774.69.

Earnings exceeded his BME in the four periods starting on 12/18/06, 1/18/07, 2/18/07, and 3/18/07. *See* United's Reply (#62) 7.[5]

## II.    <u>Plaintiff's Motion for Summary Judgment</u>

Because United prevails even on plaintiff's calculation of BME, I need not decide which calculation of BME is correct, and plaintiff's Motion for Summary Judgment [18] is moot.

## CONCLUSION

I GRANT United's Motion for Summary Judgment [51].   I DENY plaintiff's Motion for Partial Summary Judgment [18] as moot.   And I DENY United's motions to amend ([39] and [42]) as moot because United prevails without amendment.

IT IS SO ORDERED.

DATED this    31st    day of August, 2011.


/s/ Michael W. Mosman_____
MICHAEL W. MOSMAN
United States District Court

---

[5] Although my calculations differed slightly from United's as discussed above, the "over" and "under" outcomes match United's chart on page 7 of its reply brief.